UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
------------------------------------------------------------X
BASSEMA YOUSEF,

                    Plaintiff,

      -against-

AL JAZEERA MEDIA NETWORK (AJMN)
AL JAZEERA AMERICA (AJAM) and
INFINITY CONSULTING SOLUTIONS ("ICS"),

                    Defendants.
------------------------------------------------------------X

Civil Action No.: 1:16-cv-6416 (CM)

**SECOND AMENDED COMPLAINT**

**TRIAL DEMANDED BY JURY**

Plaintiff, Bassema Yousef ("Plaintiff" or "Ms. Yousef"), by her attorneys, Meister Seelig & Fein LLP, as for her Second Amended Complaint against Defendants Al Jazeera Media Network ("AJMN"), Al Jazeera America ("AJAM"), and Infinity Consulting Solutions ("ICS") (AJAM, AJMN and ICS, collectively "Defendants"), respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1. Ms. Yousef brings this action to recover damages caused by Defendants as a result of unlawful gender discrimination, sexual harassment and retaliation committed by Defendants: (i) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by, among others, the Civil Rights Act of 1991 ("Title VII"); (ii) in violation of the New York State Human Rights Law, NY Exec. Law, § 290 *et seq.* ("NYSHRL"); and (iii) in violation of the New York City Human Rights Law, NYC Admin. Code § 8-107 et *seq.* ("NYCHRL").

2. Ms. Yousef was hired by Defendants on or around January 9, 2015, as a Senior Program Manager, and during her employment performed her duties exceptionally at all times.

3. From the commencement of her employment with Defendants, Ms. Yousef was

[7839-1/5637461/1]

subject to gender discrimination and sexual harassment.

4. On or around September 4, 2015, Ms. Yousef complained to Defendants regarding the abhorrent, discriminatory conduct she was being subjected to, and on or around September 11, 2015, in a clear act of retaliation, Defendants terminated the employment of Ms. Yousef.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§1331 and §1343.

6. This Court has supplemental jurisdiction over claims under the laws of New York State and of the City of New York under 28 U.S.C. §1367.

7. Venue is proper in the Southern District of New York under 28 U.S.C. §1391(b) as a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated, in the Southern District.

8. On or about November 18, 2015, Plaintiff timely filed charges of sexual harassment and retaliation, as more fully described below, with the Equal Employment Opportunity Commission ("EEOC").

9. On or about May 20, 2016 and August 5, 2016, fewer than ninety (90) days before the filing of the Complaint, the Plaintiff received a Notice of Right to Sue.

10. Plaintiff has fully complied with all the statutory and administrative prerequisites for the filing of this action and to invoke the jurisdiction of this Court.

## THE PARTIES

11. Plaintiff is a resident of the City of Manhattan and the State of New York.

12. Defendant Al Jazeera Media Network ("AJMN") is a foreign media company incorporated in the country of Qatar. AJMN, through AJAM, regularly transacts business in the state of New York.

13. Defendant AJAM is a corporation organized and existing under the laws of Delaware with its principal place of business located at 435 Hudson Street, New York, New York 10014.

14. AJAM is a controlled subsidiary of AJMN (AJAM and AJMN, collectively "Al Jazeera"). AJAM and AJMN consist of a single employer, which, at all relevant times, employed Plaintiff under Title VII, the NYSHRL and the NYCHRL.

15. Infinity Consulting Solutions ("ICS") is a corporation engaged in the business of recruiting and human resources with a principle place of business located at 462 7th Avenue, New York, NY 10018. At all relevant times, ICS was an employer of Plaintiff under Title VII, the NYSHRL and NYCHRL.

## STATEMENT OF FACTS

**AJMN Controlled and Dominated AJAM**

16. AJMN is a media network that owns and operates numerous news networks, including AJAM. AJMN currently has over 80 bureaus around the world that are shared between the network's channels and operations.

17. AJAM is a subsidiary of AJMN. AJMN launched AJAM in August 2013 on cable and satellite systems in the United States.

18. AJMN exercises complete dominion and control over AJAM's finances, management and business practices such that AJAM has no separate mind, will or existence of its own.

19. AJAM is in fact a mere instrumentality of AJMN.

20. AJMN and AJAM co-mingled funds and other property.

21. AJMN fully and/or partially funded AJAM and, on an annual basis, AJMN

deposited money into AJAM's general disbursement account.

22. AJMN allowed AJAM little discretion in conducting its operations and business.

23. While AJAM had its own Legal, Accounting, IT and Human Resources team, most, if not all, significant decisions were subject to AJMN's approval.

24. AJMN and AJAM shared officers, directors and employees. For example, Dr. Mostefa Souag, the Director General of AJMN was the Chairman of the AJAM Board of Directors, and former CEO of AJAM, Mr. Ehab Al Shihabi, is, upon information and belief, currently working for AJMN as the Advisor to Dr. Souag.

25. As CEO of AJAM, Mr. Al Shihabi made numerous statements reflecting AJMN's domination of AJAM. For example, in an April 2015 article in Variety Magazine entitled "Al Jazeera America Management in Turmoil Amid Pressure from Parent Company," Mr. Al Shihabi stated that "[Al Jazeera] is not changing its journalistic identity for the U.S. Channel… Al Jazeera America will reflect the values and the mission of Al Jazeera."

26. Of AJAM's eight (8) members of its Board of Directors, six (6) of the Directors were employees of AJMN or one of its controlled affiliates (other than AJAM).

27. At all relevant times, AJMN's content was used and broadcasted regularly by AJAM. Upon information and belief, television shows such as Fault Lines, Listening Post, Witness and others created by AJMN were broadcast daily on AJAM's cable news network without compensation to AJMN for the content or from AJMN to AJAM for airing it. In addition, upon information and belief, television shows created by other AJMN subsidiaries, such as Al Jazeera English, were also broadcast on AJAM for no consideration and without using formal written agreements of any kind.

28. At all relevant times, all content produced by AJAM was stored on AJMN servers.

29. At all relevant times, AJMN resources were used in AJAM's day-to-day operations. For example, AJAM performance reviews were conducted using the AJMN forms and procedures.

30. At all relevant times, AJMN's email network was also used by AJAM. All employees of AJAM, AJMN and other AJMN subsidiaries use the same [name]@aljazeera.net email address format.

31. At all relevant times, AJMN and AJAM shared a website address and domain. AJAM and other AJMN subsidiaries are subdomains of the AJMN website.

32. Upon information and belief, AJMN and AJAM shared personnel, including but not limited to Mohammad Akhlaq, Ali Husseini, Alan Adair, Jonathan Garratt, Amjad Atallah, Salah Negm, Mike Marno, Owen Franks, Al Antsey, and Morag Robertson.

33. Upon information and belief, AJMN controlled AJAM's management and personnel decisions and used its dominance over AJAM to commit wrongful and illegal acts, including but not limited to Plaintiff's retaliatory termination.

34. AJMN and AJAM operated as a single entity such that it would be inequitable to uphold a legal distinction between them.

**AJMN and AJAM are a Single Employer**

35. AJMN and AJAM are a single integrated employer, and AJMN should be considered the employer of AJAM employees, including Ms. Yousef.

36. Both AJAM and AJMN are owned by the House of Thani, and AJAM is a wholly-owned subsidiary of AJMN.

37. AJAM and AJMN shared common management, including but not limited to Dr. Souag and Mr. Ehab Al-Shihabi.

38. AJAM employees often travelled to AJMN's headquarters in Doha, Qatar and

AJMN employees often travelled to AJAM's offices in New York. AJMN employees often travel and work at various AJMN subsidiaries, including but not limited to AJAM.

39. AJAM and AJMN's day-to-day operations are interrelated, and AJAM employees communicated with AJMN employees on a regular basis regarding AJAM operations. AJAM and AJMN shared storage, workflows, guidelines, content and other operations infrastructure.

40. Upon information and belief, AJAM's labor relations were centralized and controlled and directed by AJMN. Specifically, AJMN made decisions on hiring, discipline and termination of AJAM employees, routinely shifted employees between itself and AJAM, and had final authority for all major employment decisions at AJAM, including, upon information and belief, hiring and promoting Mr. Luai Bashir and terminating the employment of Ms. Yousef.

**Ms. Yousef's Employment with Defendants**

41. Al Jazeera and ICS jointly employed Plaintiff.

42. On or around November 10, 2014, Luai Bashir ("Mr. Bashir"), the Director of the Project Management Office at Al Jazeera, reached out to Plaintiff via LinkedIn asking if she would be interested in working for Al Jazeera.

43. Plaintiff met with Mr. Bashir on three separate occasions to discuss the potential project. Mr. Bashir offered Plaintiff a full-time position and scheduled an interview for Plaintiff with the Chief Financial Officer at AJAM, Mr. Anand Gupta.

44. On January 2, 2015, Plaintiff was interviewed by Mr. Gupta.

45. On January 9, 2015, Mr. Bashir sent an email to ICS' Chief Executive Officer confirming Plaintiff's hire for the position of Senior Program Manager for the duration of three months.

46. Mr. Bashir told Plaintiff that she would be offered full time employment before the

three months were completed.

47. On or around January 9, 2015, Plaintiff was directed by Mr. Bashir to go to ICS to complete the necessary paperwork to commence her employment.

48. Mr. Bashir escorted Plaintiff to the ICS office where he waited as Plaintiff completed the required documentation.

49. On or around January 9, 2015, Plaintiff commenced her employment with Defendants.

50. On January 21, 2015, Mr. Bashir sent Plaintiff a message via LinkedIn stating: "Do not look for other jobs or take other interviews…. I'm planning to pass the torch to you someday… You can't leave :-)"

51. Every two weeks, Ms. Yousef submitted her time/hours worked to ICS. ICS would then send an invoice to Mr. Bashir for approval on Al Jazeera's behalf. Once Mr. Bashir approved Ms. Yousef's time and ICS' invoice, Ms. Yousef would be compensated for her time indirectly by Al Jazeera through ICS' payroll.

**Mr. Bashir Discriminated Against and Harassed Plaintiff on the Basis of her Gender**

52. Mr. Bashir was one of Plaintiff's two direct supervisors.

53. Since the very first week of Plaintiff's employment with Defendants, Mr. Bashir began pursuing his inappropriate and unlawful intentions by using his position of power to force Plaintiff into uncomfortable situations.

54. From the commencement of Plaintiff's employment, Mr. Bashir asked Plaintiff to stay in the office well past typical and appropriate work hours, often times beyond 12:00 a.m. These requests continued until the termination of Plaintiff's employment on September 14, 2015.

55. The work assigned to Plaintiff did not require her to be at the office that late, as the

assignments were not urgent or the work did not require long hours to complete.

56. Plaintiff was uncomfortable with Mr. Bashir's requests to stay late with him, alone in the office and informed Mr. Bashir of this on numerous occasions.

57. Nonetheless, Mr. Bashir continued to ask Plaintiff to come into the office and sit with him in the conference room until late hours.

58. Mr. Bashir would often ask Plaintiff to come back during late hours. Mr. Bashir also asked Plaintiff to work with him on weekends and would text Plaintiff at all hours of the evening, complaining about personal matters.

59. Often times, Mr. Bashir asked Plaintiff to return to the office due to an "emergency" causing Plaintiff to rush back to the office. However, upon arriving to the office at such odd hours, Mr. Bashir would be alone in the conference room and would just want to talk to Plaintiff about his and her personal lives.

60. Mr. Bashir told Plaintiff that, despite her staying in the office until late, she could not submit a timesheet to ICS with more than 40 hours per workweek.

61. When Mr. Bashir and Plaintiff were alone, Mr. Bashir would engage in personal and inappropriate conversations. For example:

- Mr. Bashir spoke with Plaintiff regarding topics that were sexual in nature and would ask Plaintiff private questions;

- Mr. Bashir spoke with Plaintiff about his former girlfriends and compared Plaintiff to them. He also often asked her about her single friends, such as "Hot Amanda";

- On multiple occasions, Mr. Bashir asked Plaintiff how she deals with a husband who is never home, does not give her enough attention, and never satisfies her;

- Mr. Bashir would ask Plaintiff what types of men she prefers;

- Mr. Bashir would often suggest that Plaintiff take vacations with him;

- Mr. Bashir asked to meet Plaintiff's mother and father. Bashir asked Plaintiff, on numerous occasions, to take him shopping for clothes;

- Mr. Bashir repeatedly asked Plaintiff out to dinner after making her stay late at work, asked her to attend events with him as his "date," and asked her to go out with him for coffee.

62. Mr. Bashir would also send Ms. Yousef sexual, sexist and inappropriate text messages. For example:

- "If you die [your hair] blonde you won't be sexy anymore."

- "I'm bad cop, you're good sexy cop."

- "I love you habibti [Arabic for "my love"]"

- "A cup is as beautiful as DD. It takes a mature experienced man to see that beauty.. Only the immature and the vain is dazzled by the DDs… [o]h that dark hair. that tiny waist and tight buns.. ummmmm yummmmy…everything about her is YUM."

- "On the other hand, that bowed walk of hers tells me she's seen a good pounding before… so probably no loss."

- "You're a player like any other woman I've ever seen. I just let you play if it entertains you and makes you feel powerful."

63. When Plaintiff realized that Mr. Bashir's middle of the night calls and texts were to get her alone with him and discuss inappropriate topics, she began to avoid responding or returning to the office.

64. In response, Mr. Bashir threatened Plaintiff, saying that she worked for him and should give him the respect he deserves for trying to give her attention she would not get anywhere

else.

65. Mr. Bashir told Plaintiff to always remember who "brought her into AJAM" and that he could take it away.

66. For fear of losing her job, Plaintiff continued returning to the office after hours to oblige Mr. Bashir, and Mr. Bashir continued to call and text Plaintiff to keep him company.

67. Mr. Bashir's harassment of Plaintiff intensified and he began demanding that Plaintiff meet him at his apartment to complete "work" together.

68. On Sunday, February 15, 2015, at approximately 6:00 p.m., Mr. Bashir demanded Plaintiff meet him at his apartment under the guise of finishing an assignment.

69. Plaintiff asked if they could meet at the office but Mr. Bashir aggressively insisted that she meet him at his apartment, reminding Plaintiff "who is keeping [her] at AJAM."

70. Plaintiff felt pressured to comply with Mr. Bashir's demands, for fear of losing her job and being subjected to other forms of retaliation. When Plaintiff arrived at Mr. Bashir's apartment, he had lit candles and prepared wine and food. He also had a movie playing on the television.

71. Plaintiff became visibly uncomfortable and upset and asked Mr. Bashir to clarify the urgent work that needed to be completed. When Mr. Bashir realized Plaintiff was agitated, he became frustrated and told her to leave.

72. The following day and for the remainder of the week, Mr. Bashir was visibly angry with Plaintiff and ignored her when she asked for clarifications on assignments.

73. During that same week, on more than one occasion, Mr. Bashir asked Plaintiff to get coffee with him and upon leaving the office, Mr. Bashir would yell and berate Plaintiff for rejecting him.

74. Thereafter, Mr. Bashir continued to invite Plaintiff to meet at night and often on weekends and Plaintiff rejected his demands.

75. Once Plaintiff ceased allowing Mr. Bashir to sexually harass and intimidate her, Mr. Bashir began to punish and berate Plaintiff.

76. Mr. Bashir would lash out at Ms. Yousef for no apparent reason, as well as withhold certain work and assignments from Ms. Yousef.

77. Indeed, Mr. Bashir began a modus operandi that consisted of demanding Plaintiff meet him at inappropriate hours for "work" and if Plaintiff refused, Mr. Bashir would yell and criticize Plaintiff at the office during business hours the following day and for the duration of the week. Then he would apologize profusely and promise to "make it up to" Plaintiff.

78. For example, on or about May 11, 2015, after being "rejected" by Plaintiff, Mr. Bashir screamed at Plaintiff while at the office telling her she was "the single biggest mistake [he] ever made in this company."

79. Mr. Bashir also told Plaintiff she was ungrateful, doubtful and a worthless hire that did not listen or know how to take orders and that she did not appreciate him enough.

80. Plaintiff was mentally and emotional damaged by Mr. Bashir's sexual harassment, abuse and retaliation against her.

81. In an attempt to placate Mr. Bashir, thereafter, when Mr. Bashir called and texted Plaintiff to meet with him at all hours of the night, Plaintiff began bringing friends with her to meet Mr. Bashir.

82. This, too, angered Mr. Bashir and he continued to engage in retaliatory behavior. Mr. Bashir yelled at Plaintiff for questioning his motives, asking about work-related issues, and rejecting his invitations to meet with him on the weekends.

83. True to his discriminatory and retaliatory pattern, after Mr. Bashir unleashed his anger onto Plaintiff, he would apologize profusely and ask Plaintiff to forgive him and would try to "make it up to her" by asking her to create her own projects she wanted to work on in the office and promised to help her move to another group within AJAM.

84. At one point Mr. Bashir told Plaintiff to create her own job description so she could transition to a position in Government Relations at AJAM. Later that same day, Mr. Bashir yelled at Plaintiff in public and left her crying. Mr. Bashir then texted Plaintiff to tell her once again that she was the worst mistake he made for the company. Mr. Bashir then texted Plaintiff "habibti [an Arabic word for "my love"], you know I care about you no matter what flare ups we have. Every time I reach out or try to make you happy, somehow I end up feeling insulted & hurt but I simply had enough and can't keep draining my emotions trying to make you happy."

85. For Plaintiff's birthday, Mr. Bashir insisted that they not go to the office and instead go get facials and massages as his birthday gift to Plaintiff.

86. Plaintiff feared being verbally abused and retaliated against, and met Mr. Bashir at Bliss Spa. When Plaintiff and Mr. Bashir arrived at the Spa, Mr. Bashir insisted on booking a couples' massage, however Plaintiff insisted on only a facial and Mr. Bashir hesitated to argue in front of the clerk.

87. Mr. Bashir then told Plaintiff they were going to for sushi for dinner next door. Plaintiff, again, for fear of being verbally abused and retaliated against, quickly ate her meal with Mr. Bashir, and then asked Mr. Bashir if she could be excused. Mr. Bashir became angry and told her to leave.

88. On May 22, 2015, Mr. Bashir asked Plaintiff where she was via text and Plaintiff responded she was with people. Mr. Bashir responded, "if you are with women, you are welcome

but if you are with men forget it."

89. In another instance, Plaintiff needed to be away from the office from August 12, 2015, to August 25, 2015 for personal reasons and requested to telework.

90. Mr. Bashir agreed to the telework dates and approved her request. Teleworking was not only normal for Al Jazeera employees but Plaintiff did not have her own work space - such as a cubicle, desk or location. Plaintiff was routinely asked to telework.

91. Thereafter, three days prior to her departure, Mr. Bashir insisted Plaintiff not leave because he did not want to be alone and was unhappy Plaintiff was leaving him. Plaintiff informed Mr. Bashir her father was gravely ill and she needed to be with him.

92. Mr. Bashir became angry, threatened to not approve Plaintiff's time card, and threatened to fire Plaintiff.

93. Plaintiff left to tend to her ailing father and upon her return Mr. Bashir was on vacation.

94. While on vacation, Mr. Bashir disapproved Plaintiff's time sheet. Plaintiff reached out to Mr. Bashir on September 2, 2015 and Mr. Bashir then invited Plaintiff to meet to discuss his reasons for not approving her request upon his return.

**Plaintiff Engages in Protected Activity and is Subsequently Terminated**

95. After enduring Mr. Bashir's discriminatory and harassing treatment of her for months, on September 2, 2015, Plaintiff spoke with and emailed HJ Chang ("Chang"), Senior Vice President, Human Resources of AJAM, requesting a meeting so that she could inform her of Mr. Bashir's harassment.

96. Chang insisted on inviting Mr. Bashir to the meeting and cc'ed Mr. Bashir on her response to Plaintiff. Plaintiff asked that Chang meet with her and Mr. Bashir separately. Chang

refused and thereafter ceased communicating with Plaintiff.

97. Plaintiff reached out to Chang three more times on September 3, 2015, September 8, 2015, and September 10, 2015, requesting a meeting to discuss the harassment and other issues, however Chang refused to meet with Plaintiff.

98. Plaintiff then reached out to Kevin Hyatt, Human Resources Manager with ICS, and asked to meet to discuss the aforementioned matters which included the unwanted advances by Mr. Bashir.

99. Plaintiff went to the ICS office on September 4, 2015, and spoke at length with Kevin Hyatt regarding all her concerns including hostile work environment, sexual harassment, harassment, discrimination, unpaid work hours, verbal abuse and retaliation.

100. On September 4, 2015, Mr. Bashir insisted on meeting with Plaintiff at 2:00 p.m. in the conference room located at the AJAM office at 34th Street and 8th Avenue.

101. Mr. Bashir was visibly intoxicated as his speech was slurred, his eyes were red and his clothes were dirty and disheveled. He apologized to Plaintiff profusely and stated he would start giving Plaintiff "real work" to do immediately and that he had the full backing of the President of Al Jazeera to move forward.  Mr. Bashir spoke to Plaintiff about timelines and goals, and planned a roadmap of work and projects for the upcoming 6-8 months.

102. Without warning, on September 11, 2015, Plaintiff's Al Jazeera email access was terminated.

103. On September 13, 2015, Plaintiff received a text message from Mr. Bashir asking if she had time to talk over the phone.  Understanding that she had been terminated, Plaintiff responded that she knew what Mr. Bashir wanted to speak about.  Plaintiff and Mr. Bashir did not communicate afterwards.

104. On September 14, 2015, Plaintiff was told by Kevin Hyatt of ICS to turn in her work laptop.

105. Defendants would not have terminated Plaintiff but for her complaint of Mr. Bashir's sexual harassment, hostility, discriminatory conduct and verbal abuse.

106. Defendants' actions were intended to create a working environment that no reasonable person would tolerate.

107. Defendants' actions were intended to create a hostile working environment and did in fact create a hostile work environment for Plaintiff.

### AS AND FOR A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER TITLE VII

108. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

109. Defendants subjected Plaintiff to unlawful sexual harassment, disparate treatment and a hostile work environment on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

110. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages in the form of past and future earnings, other employment benefits, emotional injuries, in an amount to be determined at trial but not less than Five Hundred Thousand Dollars ($500,000.00).

111. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000.00).

### AS AND FOR A SECOND CAUSE OF ACTION
### RETALIATION UNDER TITLE VII

112. Plaintiff hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs as if fully set forth herein.

113.  Plaintiff engaged in protected activity and opposed Mr. Bashir's illegal and discriminatory acts against her by complaining to Defendants regarding Mr. Bashir's discriminatory and harassing conduct on the basis of her gender.

114.  As a direct and proximate result of Plaintiff's complaints to Defendants regarding Mr. Bashir's illegal discriminatory remarks and acts, Defendants retaliated against Plaintiff and terminated her employment, in violation of Title VII.

115.  As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm and damages for past and future earnings, other employment benefits, emotional injuries in an amount to be determined at trial but not less than Five Hundred Thousand Dollars ($500,000.00).

116.  Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000.00).

### AS AND FOR A THIRD CAUSE OF ACTION
### DISCRIMINATION UNDER NYSHRL

117.  Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

118.  Defendants engaged in unlawful discrimination against Plaintiff on the basis of her gender, in violation of NYSHRL, NY Exec. L. § 290 et seq., by subjecting Plaintiff to a hostile work environment, discriminating against her with regards to the terms and conditions of her employment, harassing Ms. Yousef, and by terminating her employment.

119.  As a direct and proximate result, Plaintiff suffered damages for past and future earnings, other employment benefits, emotional injuries in an amount to be determined at trial but

not less than Five Hundred Thousand Dollars ($500,000).

## AS AND FOR A FOURTH CAUSE OF ACTION
### RETALIATION UNDER NYSHRL

120.  Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

121.  The NYSHRL states that "it shall be an unlawful discriminatory practice… to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. L. §296(7).

122.  Ms. Yousef engaged in protected activity and opposed Mr. Bashir's illegal discriminatory acts against his colleagues by complaining to Defendants regarding Mr. Bashir's discriminatory and harassing conduct on the basis of Plaintiff's gender.

123.  Because Ms. Yousef complained to Defendants regarding Mr. Bashir's illegal remarks and acts, Defendants willfully retaliated against Ms. Yousef by terminating her employment in violation of the NYSHRL.

124.  As a direct and proximate result, Plaintiff suffered damages for past and future earnings, other employment benefits, emotional injuries in an amount to be determined at trial but not less than Five Hundred Thousand Dollars ($500,000).

## AS AND FOR A FIFTH CAUSE OF ACTION
### DISCRMINATION UNDER THE NYCHRL

125.  Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

126.  Defendants engaged in unlawful discrimination against Plaintiff on the basis of her gender, in violation of the NYCHRL, NYC Admin Code § 8-107 et. seq., and more particularly

NYC Admin. Code §§ 8-107(1)(6)(7), by subjecting Plaintiff to a hostile work environment, discriminating against her with regards to the terms and conditions of her employment, sexually harassing Ms. Yousef, and by terminating her employment.

127. As a direct and proximate result, Plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial but not less than Five Hundred Thousand Dollars ($500,000).

128. Because Defendants intentionally discriminated against Ms. Yousef, Ms. Yousef should also be awarded punitive damages in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000.00).

## AS AND FOR A SIXTH CAUSE OF ACTION
## RETALIATION UNDER THE NYCHRL

129. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

130. The NYCHRL mandates that it "[s]hall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter…" N.Y. City Admin. Code §8-107(7)

131. Ms. Yousef engaged in protected activity and opposed Mr. Bashir's illegal discriminatory acts against her by complaining to Defendants regarding Mr. Bashir's discriminatory and harassing conduct on the basis of her gender.

132. Because Ms. Yousef complained to Defendants regarding Mr. Bashir's illegal discriminatory remarks and acts, Defendants retaliated against Ms. Yousef by terminating her employment in violation of the NYCHRL.

133. Defendants' actions toward Ms. Yousef are more than likely to deter another Al

Jazeera employee from engaging in protected activity

134. As a direct and proximate result, Plaintiff suffered damages for past and future earnings, other employment benefits, emotional injuries in an amount to be determined at trial but not less than Five Hundred Thousand Dollars ($500,000).

135. Because Defendants willfully retaliated against Ms. Yousef, Ms. Yousef should also be awarded punitive damages in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000.00).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court issue a judgment against all Defendants as follows:

A. Awarding compensatory damages in an amount to be determined at trial but no less than $3,000,000.00

B. Awarding punitive damages in an amount to be determined at trial, but not less than $20,000,000.00;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonably attorneys' fees and costs; and

D. Any other and further relief the Court deems just and proper

Dated: New York, NY
April 23, 2017

**MEISTER SEELIG & FEIN LLP**

_____
Howard S. Koh, Esq.
125 Park Avenue, 7th Floor
New York, New York 10017
9212) 655-3550
*Attorneys for Plaintiff*

[7839-1/5637461/1]